IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OKLAHOMA

DAVID PLUNKETT, as Special Administrator for the Estate of ZACHARY PLUNKETT, deceased,

      Plaintiff,

vs.                                              No. 18-cv-125-WPJ-JFJ

ARMOR CORRECTIONAL HEALTH SERVICES, INC., et al.,

      Defendant.

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

**THIS MATTER** comes before the Court upon Defendants' Motions to Dismiss. *See* Docs. 7, 13, 17, 24, 28 & 31. David Plunkett ("Plaintiff") in the underlying lawsuit alleges that the six named Defendants are liable for the injuries Zachary Plunkett ("Mr. Plunkett") sustained from inadequate medical treatment he received while detained at the Tulsa County Jail. In the instant Order, the Court addresses only those Motions filed by Defendants Curtis McElroy, M.D. ("Dr. McElroy"), Nurse Pamela Wood ("Nurse Wood"), and Nurse Sundae Phillips ("Nurse Phillips") due to the similarity of their arguments as well as their direct involvement in Mr. Plunkett's medical care. *See* Docs. 13, 17 & 31. Having carefully reviewed the pleadings and the applicable law, the Court finds that Plaintiff may proceed only with his Section 1983 claim against Defendants Dr. McElroy and Nurse Wood. Therefore, the Motions are **GRANTED IN PART** and **DENIED IN PART.**

# BACKGROUND[1]

Mr. Plunkett was booked into the Tulsa County Jail on or about June 16, 2016. At some point before being admitted to the Jail, Mr. Plunkett had suffered an injury to his tailbone and buttocks. Aware of this injury, jail staff initially placed him in an unsanitary isolation cell for eighteen hours, where he allegedly contracted Methicillin-resistant Staphylococcus aureus ("MRSA") in said injured area. Staff then transferred him to the general population "J-pod." Two days passed before Mr. Plunkett began experiencing alarming symptoms: a sore and severe pain above his rectum, profuse sweating, and general weakness. He could not sit, had difficulty walking without assistance, and started complaining to detention staff about these symptoms.

Eventually, Mr. Plunkett submitted his first written "sick call" request to the jail medical staff on June 22, stating: "I HAVE EXTREME PAIN AND SWELLING ON MY TAIL BONE AND PELVIS AND CANT SIT DOWN CAN BARELY WALK…NEED TO SEE NURSE AS SOON AS POSSIBLE." Spurring this complaint was the development of an abscess on Mr. Plunkett's rear end, festered by his underlying MRSA infection. The same day, Mr. Plunkett was seen by Nurse Pamela Wood, to whom he relayed several complaints. First, he could feel a "softball size . . . knot" that had "swollen [his] butt cheeks together." Second, the worsening pain had become so severe that he had to sleep on his stomach and had major difficulty urinating or having bowl movements. Third, he stated that "any walking [or] sitting on it causes instant fire."

Thereafter, Nurse Wood took Mr. Plunkett's vital signs and recorded a sitting pulse rate of 133, which is consistent with tachycardia. Despite these facts, Nurse Wood did not examine the injured area or promptly refer him the jail physician. Instead, she gave Mr. Plunkett ibuprofen and sent him back to his cell, acknowledging that ibuprofen was "not helping at all." Needing physical

---

[1] The Amended Complaint outlines the following factual allegations, which the Court accepts as true and views in the light most favorable to Plaintiff. *See Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010).

assistance to walk from the J-pod to the medical unit, Mr. Plunkett visited Armor Medical Director Curtis McElroy the following day on June 23. Upon observing Mr. Plunkett's bleeding sore, Dr. McElroy stated, "I don't know what it is," and decided the best path forward was to send Mr. Plunkett back to his cell, continue Nurse Wood's treatment plan, and "see if it gets better."

Mr. Plunkett's condition did not improve. With blood and puss now seeping through his jail clothing, Mr. Plunkett was forced to create a make-shift diaper to contain the discharge, which was observed by multiple nurses. For the next four days, Mr. Plunkett visited the medical unit twice per day to receive Tylenol 3 and/or codeine. Each visit, he requested to see the physician but never received placement on the waitlist. At one point, he begged the medical unit detention staff to send him to the hospital, to which a jail officer responded: "Go back to your f**king pod!"

Mr. Plunkett on June 26, 2016, at 9:45 p.m. submitted another sick call request: "OVER THE WEEKEND MY CONDITION HAS BECOME A LOT WORSE . . . THERE ARE NOW HUGE BLISTERS OOZING A WHITE MILKY LIQUID . . . PAIN IS 10X WORSE . . . I NEED TO SEE THE DOCTOR IMMEDIATELY . . . ITS INFECTED BADLY . . . THIS IS AN EMERGENCY . . . AND I DO BELIEVE I NEED TO GO TO THE ER . . . BLOOD WAS ALL OVER MY SHEETS THE PAST 4 MORNINGS." Ten hours passed before Nurse Sundae Phillips notified Mr. Plunkett at 7:15 a.m. on June 27 that she had scheduled him to see the physician. She documented in the system that Mr. Plunkett had "open wounds to the buttocks" and needed to be seen by the physician "today [on June 27]." Mr. Plunkett, however, was not seen by any health care provider on June 27 and, instead, spent the day lying in his cell.

Forty-one hours following his request, Mr. Plunkett was sent to the medical unit at about 2:45 pm on June 28, 2016. Once again, jail staff had to physically assist Mr. Plunkett from the J-pod to the medical unit where he was first assessed by Nurse Peggy Compton. He relayed his

3

recurring complaints, and she noted that his extremities appeared "[a]bnormal," documenting "severe swelling at the coccyx area with known bleeding." Around 3:00 p.m., Dr. McElroy examined Mr. Plunkett, noting his "increased pain, swelling . . . nightly bleeding" and "white drainage." He indicated Mr. Plunkett as having "intergluteal hematoma" or "abscess [sic]" and transferred him to the ER for evaluation.

Upon Mr. Plunkett's June 28 arrival at the Hillcrest Emergency Room, the overseeing physician gasped: "Oh my God! What happened?!" The physician further remarked that "You only see things like this in third world countries." Immediately apparent to the medical staff was that Mr. Plunkett had developed a "massive peri-rectal abscess replete with eggs from parasites," MRSA, and "severe sepsis" for which he was administered IV antibiotics and given daily wound care. The medical staff surgically removed the abscess, a large portion of skin, and dead tissue. Mr. Plunkett remained at the hospital until July 2.

Based on these allegations, Plaintiff asserts three causes of action against Defendants Dr. McElroy, Nurse Wood, and Nurse Phillips: (1) a claim pursuant to 42 U.S.C. § 1983 for deliberate indifference to a serious medical need in violation of Mr. Plunkett's Eighth and Fourteenth Amendment rights, (2) a negligence claim under Oklahoma's common law; and (3) a claim for failure to provide adequate medical care in violation of Article II Sections 7 and 9 of the Oklahoma Constitution.

## DISCUSSION

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that a defense of "failure to state a cause of action upon which relief can be granted" may be raised by motion to dismiss. Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a plaintiff must allege facts that "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A

complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). To satisfy the plausibility standard, a plaintiff's allegations must show that defendant's liability is more than a "sheer possibility." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotations omitted). When applying this standard, the Court must "accept as true all well pleaded factual allegations" and view those allegations "in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010). The Court now applies this standard to Plaintiff's three claims.

## I. Section 1983, Fourteenth Amendment Violation

Section 1983 provides a claim for relief against state actors for violation of a plaintiff's federal rights. *Becker v. Kroll*, 494 F.3d 904, 913 (10th Cir. 2007) (citing 42 U.S.C. § 1983). This claim boils down to whether Defendants violated Mr. Plunkett's Fourteenth Amendment rights by exhibiting "deliberate indifference to serious medical needs of [Mr. Plunkett] constitut[ing] the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal citation and quotation omitted). While Mr. Plunkett was technically a "pre-trial detainee" and not a prisoner, the Tenth Circuit has long applied the same test for deliberate indifference claims brought by both prisoners and pretrial detainees. *Clark v. Colbert*, 895 F.3d 1258, 1267 (10th Cir. 2018) (citation omitted).

Plaintiffs who assert deliberate indifference claims generally allege two types of prohibited conduct. The first is when a "medical professional . . . fail[s] to treat a serious medical condition

properly." *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000).[2] The second is the so-called "gatekeeper theory": when a prison official "prevent[s] an inmate from receiving treatment or den[ies] him access to medical personnel capable of evaluating the need for treatment." *Id.* at 1231 (citation omitted).[3] Nevertheless, neither medical malpractice nor "an inadvertent failure to provide adequate medical care cannot be said" to constitute such a violation. *Estelle*, 429 US at 105.

Most importantly, to establish his deliberate indifference claim, Plaintiff "must prove both an objective component and a subjective component." *Redmond v. Crowther*, 882 F.3d 927, 939 (10th Cir. 2018) (citation omitted). Therefore, the Court proceeds in two strides. First, the Court addresses the objective component—whether Mr. Plunkett's injuries were "sufficiently serious"—which applies to all three Defendants. *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006). Second, the Court assesses the subjective component—namely, whether each Defendant "kn[ew] of and disregard[ed] an excessive risk to [Mr. Plunkett's] health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

### A. Objective Component

To satisfy this prong, Plaintiff must establish that "the alleged harm (such as heart damage) is *sufficiently serious* . . ., rather than whether the symptoms displayed to the prison employee are

---

[2] The Tenth Circuit has since identified three contexts in which a medical professional's missed diagnosis or delayed referral may be obvious:
> (1) a medical professional recognizes an inability to treat the patient due to the seriousness of the condition and his corresponding lack of expertise but nevertheless declines or unnecessarily delays referral . . . ; (2) a medical professional fails to treat a medical condition so obvious that even a layman would recognize the condition; and (3) a medical professional completely denies care although presented with recognizable symptoms which potentially create a medical emergency . . .

*Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006).

[3] A prison medical professional who serves solely "as a gatekeeper for other medical personnel capable of treating the condition" may be liable under this standard if he or she "delays or refuses to fulfill that gatekeeper role" due to deliberate indifference. *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). Gatekeeper claims are "actionable only in cases where the need for additional treatment or referral to a medical specialist is obvious." *Crum*, 439 F.3d at 1232.

6

sufficiently serious." *Mata v. Saiz*, 427 F.3d 745, 753 (10th Cir. 2005) (emphasis added). A delay in medical care is only sufficiently serious if "the plaintiff can show the delay resulted in substantial harm. *Id.* at 754. Furthermore, a "lifelong handicap, permanent loss, or considerable pain" may satisfy the substantial harm requirement. *Id.* at 751 (quotation and citation omitted).

The Court's determination of the objective component is informed by the following factual allegations:

- Mr. Plunkett's June 22 sick call request: "I HAVE EXTREME PAIN AND SWELLING ON MY TAIL BONE AND PELVIS AND CANT SIT DOWN CAN BARELY WALK . . . NEED TO SEE NURSE AS SOON AS POSSIBLE."

- Mr. Plunkett's first visit to the infirmary, including his observed inability to walk without assistance and his statements to Nurse Wood regarding (1) a "softball size knot" that had "swollen [his] butt cheeks together," (2) worsening pain so severe he had to sleep on his stomach, (3) major difficulty urinating or having bowl movements, and (4) "walking [or] sitting on it causes instant fire." Nurse Wood's recording his heart rate as consistent with tachycardia and giving only ibuprofen before sending him back to his cell.

- The next four days, with blood and puss oozing from the abscess and covering his bedsheets every morning, forcing him to wear a makeshift diaper.

- Mr. Plunkett's June 26 kiosk request: "OVER THE WEEKEND MY CONDITION HAS BECOME A LOT WORSE . . . THERE ARE NOW HUGE BLISTERS OOZING A WHITE MILKY LIQUID . . . PAIN IS 10X WORSE . . . I NEED TO SEE THE DOCTOR IMMEDIATELY . . . ITS INFECTED BADLY . . . THIS IS AN EMERGENCY . . . AND I DO BELIEVE I NEED TO GO TO THE ER . . . BLOOD WAS ALL OVER MY SHEETS THE PAST 4 MORNINGS."

- The passage of forty-one hours before Mr. Plunkett sees the jail physician, who immediately transfers him to the ER where he is diagnosed with "a massive peri-rectal abscess replete with eggs from parasites," MRSA, and severe sepsis. He was administered IV antibiotics, daily wound care, surgical removal of the abscess, a large portion of skin, and dead tissue.

- The ER physician's exclamation that "[y]ou only see [injuries] like this in third world countries."

In short, the Court easily finds that the foregoing facts plausibly establish that Mr. Plunkett's injuries were "sufficiently serious" resulting in "substantial harm" and "considerable pain" to Mr. Plunkett. *See Mata*, 427 F.3d at 751.

### B. Subjective Component

Under this prong, a prison official cannot be liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 US at 837; *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008) ("[I]t is particularly important in such circumstances that the complaint make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state."); *Vasquez v. Davis*, 882 F.3d 1270, 1275 (10th Cir. 2018) (holding that each defendant must personally participate in the alleged constitutional violation to be held liable).[4]

#### 1. Plaintiff has plausibly alleged that Nurse Wood and Dr. McElroy satisfy the subjective component prong.

##### a. Nurse Wood

First, Plaintiff's well-pleaded factual allegations suggest that Nurse Wood knew of and disregarded an excessive risk to Mr. Plunkett's health. As the first alleged medical official to screen Mr. Plunkett on June 22, Nurse Wood observed his inability to walk without assistance, recorded his heart rate as consistent with tachycardia, and listened to his three alarming complaints: that (1) he could feel a "softball size knot" that had "swollen [his] butt cheeks together," (2) the worsening

---

[4] Plaintiff argues that the Court should omit the subjective component in lieu of the Supreme Court's holding in *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015). The Tenth Circuit, however, has since held in *Strain v. Regalado* that: "At no point did *Kingsley* pronounce its application to Fourteenth Amendment deliberate indifference claims or otherwise state that we should adopt a purely objective standard for such claims, so we cannot overrule our precedent on this issue." 977 F.3d 984, 993 (10th Cir. 2020) (citation omitted).

pain had become so severe that he had to sleep on his stomach and had major difficulty urinating or having bowl movements, and (3) "any walking [or] sitting on it causes instant fire." Despite the severity, she did not evaluate the infected area—the crux of his complaints—nor did she promptly send him to Dr. McElroy. Instead, Nurse Wood gave Mr. Plunkett ibuprofen before sending him back to his cell. The height of her culpability was her explicit acknowledgment that ibuprofen was "not helping at all" and the continuation of similar treatment for four days.

These alleged facts plausibly suggest an egregious mismatch between Mr. Plunkett's serious symptoms and Nurse Wood's prescribed treatment, including her decision to not promptly refer him to Dr. McElroy. *See Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000). Her involvement, treatment, and statement—as well as the circumstantial evidence described in Section I(B)(1)(c)—plausibly establish that she *knew of* and *disregarded* the excessive risk posed to Mr. Plunkett's health and safety. *Farmer*, 511 US at 837. Therefore, the Court finds that Plaintiff has pleaded sufficient facts to plausibly establish the subjective component as applied to Nurse Wood. *See Mata*, 427 F.3d at 758 (allowing claim against a nurse who knew the inmate was suffering from severe chest pains yet "completely refused to assess or diagnose" the potential cardiac emergency in violation of prison medical protocols). *Contra Sealock*, 218 F.3d at 1211 (holding that the subjective component was not met where a prison nurse misdiagnosed an inmate's chest pains as the flu and failed to recognize symptoms suggesting an impending heart attack).

### b. Dr. McElroy

Plaintiff's well-pleaded factual allegations similarly suggest that Dr. McElroy also knew of and disregarded the excessive risk to Mr. Plunkett's health. According to the Amended Complaint, Dr. McElroy first became aware of Mr. Plunkett's condition when Mr. Plunkett visited

him on June 23, the day after Mr. Plunkett met with Nurse Wood. He observed Mr. Plunkett's inability to walk and listened to Mr. Plunkett's same alarming complaints. Moreover, when Dr. McElroy observed Mr. Plunkett's bleeding abscess, he remarked "I don't know what that is," potentially reflecting his inability to treat the condition. Ultimately, Dr. McElroy decided that the best path forward was to "see if it gets better" by continuing Nurse Wood's ineffectual treatment plan. As in the preceding section, the Court finds that these facts plausibly evidence an egregious mismatch between Mr. Plunkett's condition and Dr. McElroy's continuation of Nurse Wood's treatment plan. Moreover, his involvement, statement, and treatment plan—in addition to the supporting circumstantial evidence in Section I(B)(1)(c)—collectively establish that he plausibly *knew of* and *disregarded* an excessive risk to Mr. Plunkett's health and safety. *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006). If anything, Dr. McElroy's culpability is more severe than Nurse Wood's, given his doctorate education and positions as the Tulsa County Jail physician and Armor Medical Director. Given his stature, Dr. McElroy should have had a stronger ability and obligation than Nurse Wood to detect and diagnose the severity of Mr. Plunkett's symptoms.

### c. Alleged Circumstantial Evidence

Under Nurse Wood and Dr. McElroy's watch, Mr. Plunkett sustained injuries "[y]ou only see in third world countries," according to the Hillcrest Hospital Emergency Room physician, an assessment with which the Court whole heartedly agrees. In addition to his three alarming complaints, blood and puss oozed from the abscess on his rear for four days, covering his bedsheets every morning and forcing him to create and wear a makeshift diaper. When Mr. Plunkett was finally transferred to the ER, it became readily apparent that he had developed a "massive peri-rectal abscess replete with eggs from parasites," MRSA, and "severe sepsis." Notably, Defendants in their briefs conveniently refrain from addressing the eye-

popping severity of Mr. Plunkett's injuries. Overall, the Court finds that the alleged obviousness of Mr. Plunkett's symptoms, the extreme nature of his resulting injuries, and the delay in his transfer to the ER all provide robust circumstantial evidence reflecting Nurse Wood and Dr. McElroy's culpability. *See Rife v. Oklahoma Dept. of Pub. Safety*, 854 F.3d 637, 647 (10th Cir. 2017) ("[T]he existence of an obvious risk to health or safety may indicate awareness of the risk.") (citation omitted); *DeSpain v. Uphoff*, 264 F.3d 965, 975 (10th Cir. 2001) ("Because it is difficult, if not impossible, to prove another person's actual state of mind, whether an official had knowledge may be inferred from circumstantial evidence.") (citation omitted).

Furthermore, a contrasting example sheds light on the Court's rationale here. In *Randolph v. Glanz*, the prison medical staff misdiagnosed the plaintiff's condition as pink eye and accordingly prescribed him eye drops, causing him to lose 85% of his vision. No. 16-cv-0154, 2016 WL 4992497, at *1 (N.D. Okla. Sept. 16, 2016) (Eagan, J.). At the motion to dismiss stage, the District Court held that a swollen eye is not the type of ailment that generally points to a risk of more serious harm, and that the medical unit's treatment did not rise to extraordinary neglect of medical care. *Id.* at *3–*4 The instant facts, on the other hand, do not reflect a misdiagnosis of a non-severe ailment. For one, both Nurse Wood and Dr. McElroy were unable to diagnose Mr. Plunkett in the first place, and despite the severity of his condition, they continued a treatment plan explicitly recognized as ineffectual—for four days. This was not a situation in which "a doctor orders treatment consistent with the symptoms presented and then continues to monitor the patient's condition." *Crum*, 439 F.3d at 1232. To the contrary, the alleged facts at bar suggest "more than ordinary lack of due care for the prisoner's interests or safety." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (quotations and citation omitted).

      **d.**    **Defendants' Arguments**

At this stage, Defendants' arguments are unavailing. Defendants characterize Plaintiff's allegations as a "mere difference in judgment" on how to properly treat Mr. Plunkett's medical condition. According to Defendants, Plaintiff cannot establish that the medical staff intentionally disregarded Mr. Plunkett's symptoms, nor that their prescribed course of treatment would result in a substantial risk of serious harm. Further, Defendants assert they had a "significant" level of involvement in Mr. Plunkett's treatment—through which he visited the medical unit twice per day for four days to receive ibuprofen, codeine, and Tylenol 3. Contrary to Defendants' assertion, however, providing only *some* modicum of treatment is not sufficient to absolve themselves from liability for potential deliberate indifference to his serious medical concerns. *See Oxendine v. Kaplan*, 241 F.3d 1272, 1277 n.7 (10th Cir. 2001) (rejecting government's argument that it was "dispositive . . . that Oxendine received at least some treatment from Dr. Kaplan during the time period when he alleged that he received inadequate and delayed medical care"). Put simply, this case involves more than a mere disagreement with Mr. Plunkett's treatment plan.

Second, Defendants correctly and importantly assert that if their alleged conduct amounts to nothing more than medical malpractice, then the Court must dismiss Plaintiff's Section 1983 claim. *Perkins v. Kansas Dept. of Corrections*, 165 F.3d 803, 811 (10th Cir. 1999). At this juncture, however, the Court simply finds that Plaintiff has established sufficient allegations to warrant the plausible inference that their conduct could amount to deliberate indifference. It is not yet clear whether their alleged conduct best qualifies as medical malpractice or deliberate indifference—an exceedingly difficult line to draw in the first place. Therefore, further discovery is necessary to iron out this wrinkle although in making this ruling, the Court relies in part on the alleged statement made by the Hillcrest Emergency Room physician upon examining Mr. Plunkett's condition that his condition is what "…you only see in third world countries."

### 2. Plaintiff has not plausibly alleged that Nurse Phillips satisfies the subjective component prong.

Conversely, Nurse Phillips played a much more limited role. According to the Amended Complaint, her only relevant conduct consists of: (1) notifying Mr. Plunkett ten hours following the second sick call request that she had arranged for him to see the jail physician; and (2) noting within the medical unit system the same day that Mr. Plunkett needed to see the physician "today [on June 27]." The fact that Mr. Plunkett did not see Dr. McElroy for forty-one hours following the second sick call request—contrary to her notation within the system—does not warrant the plausible inference that Nurse Phillips was responsible for the delay. In other words, Plaintiff has not plausibly alleged that Nurse Phillips had any supervisory authority or control over the speed at which Dr. McElroy responded to notations within the system. These facts do not sufficiently establish that Nurse Phillips knew of and deliberately disregarded a serious risk to Mr. Plunkett's health and safety. *See Burke v. Regalado*, No. 18-CV-231-GKF-FHM, 2019 WL 1371144, at *4–*7 (N.D. Okla. Mar. 26, 2019); *Farmer*, 511 US at 837. Therefore, the Court must dismiss Plaintiff's Section 1983 claim as asserted against Nurse Phillips.

## II. State Law Claims: Common Law Negligence and Violations of Article II §§ 7 & 9 of the Oklahoma Constitution

Plaintiff asserts against Defendants two causes of action arising from state law: (1) common law negligence and (2) a violation of Mr. Plunkett's right to be free from cruel and unusual punishment under Article II §§ 7 and 9 of the Oklahoma Constitution. In response, Defendants argue that they are immune from such claims pursuant to the Oklahoma Government Tort Claims Act ("GTCA"). OKLA. STAT. TIT. 51 §§ 152 *et seq.*[5]

---

[5] When a federal court exercises supplemental jurisdiction over state law claims—such as the Court in the instant case—it must apply the substantive law of the forum state. *See BancOklahoma Mortg. Corp. v. Capital Title Co., Inc.*, 194 F.3d 1089, 1103 (10th Cir. 1999).

Several GTCA provisions are relevant here. Importantly, Section 152.1(A) states: "The State of Oklahoma does hereby adopt the doctrine of sovereign immunity. The state, its political subdivisions, and all of their *employees* acting within the scope of their employment, whether performing governmental or proprietary functions, shall be immune from liability for *torts*." OKLA. STAT. TIT. 51 § 152.1(A) (emphasis added). The statute defines "torts" as "a legal wrong, independent of contract, involving violation of a duty imposed by *general law*, statute, [and] *the Constitution of the State of Oklahoma*," thereby implicating both of Plaintiff's claims. OKLA. STAT. TIT. 51 § 152(14) (emphasis added). It further reads: "The State or a political subdivision shall not be liable if a loss or claim results from: (25) Provision, equipping, operation or maintenance of any prison, jail or correctional facility . . . ." OKLA. STAT. TIT. 51 § 155(25).

The core question, then, becomes whether Defendants are "employees" as defined by the Oklahoma GTCA. In relevant part, the GTCA defines "employee" to mean any "licensed medical professionals under contract with city, county, or state entities who provide medical care to inmates or detainees in the custody or control of law enforcement agencies." OKLA. STAT. TIT. § 152(7)(b)(7). Plaintiff argues in his Amended Complaint that Dr. McElroy, Nurse Wood, and Nurse Phillips all worked as employees and agents of Armor Correctional Health Services, Inc., the Board of County Commissioners of Tulsa County, and the Tulsa County Sheriff's Office. Doc. 4 at 23. Furthermore, Armor contracted as a private corporation with Oklahoma to provide healthcare services to inmates at the Tulsa County Jail, an arrangement through which Defendants treated Mr. Plunkett's medical condition. Therefore, the Court finds that Defendants are Oklahoma "employees" as defined by Section 152(7)(b)(7) and are, thus, immune from both of Plaintiff's

state law claims.⁶ Plaintiff's argument that Defendants are not employees because they lack privity of contract with the state is an overly restrictive view of this provision.

This finding is well-supported by the Oklahoma Supreme Court's recent decision in *Barrios v. Haskell County Public Facilities Auth. et. al.*, 432 P.3d 233, 236, 238–39 (OK 2018). Relevantly, the *Barrios* Court "assumed" that Turn-Key Health, LLC, a medical care corporation that had contracted with Tulsa County, and its employees, were entitled to GTCA immunity as "employees" under OKLA. STAT. TIT. 51 § 152(7)(b). *Barrios*, 432 P.3d at 236 n.5. In reaching its holding, the Court stated: "[g]enerally speaking, the staff of a healthcare contractor at a jail are 'employees' who are entitled to tort immunity under the GTCA by virtue of [OKLA. STAT. TIT. 51] sections 152(7)(b), 153(A), and 155(25)." *Id.* Relying on *Barrios*, at least three other District Courts in the Northern District of Oklahoma have recently held that private corporations—and their employees—that contract with the state to provide healthcare services are entitled to immunity from torts arising out of the "operation or maintenance of any prison, jail, or correctional facility." *See Birdwell v. Glanz*, No. 15-cv-304-TCK-FHM, 2019 WL 1130484, at *10 (N.D. Okla. Mar. 12, 2019), *reversed on other grounds by* 790 Fed.Appx. 962 (10th Cir. 2020); *Prince v. Turn Key Health Clinics, LLC*, No. 18-cv-0282-CVE-JFJ, 2019 WL 238153, at *9 (N.D. Okla. Jan. 16, 2019); *Burke v. Regalado*, No. 18-CV-231-GKF-FHM, 2019 WL 1371144, at *3 (N.D. Okla. Mar. 26, 2019). The Court finds no reason to deviate from this case law.

Plaintiff's constitutional claim must fail for a second reason: the Oklahoma Supreme Court in *Barrios* held that Article II Sections 7 and 9 of the Oklahoma Constitution do not allow an inmate to bring a tort claim for denial of medical care. 432 P.3d at 235. While the Oklahoma Supreme Court distinguished *Barrios* two years later by granting a private right of action under

---

⁶ Having found Defendants immune from Plaintiff's state law claims, the Court does not reach the question of whether the applicable statute of limitations also bars Plaintiff's claims.

15

Section 9, that opinion is confined to factual bases having accrued before the Oklahoma legislature amended the GTCA in 2014—a change that precipitated *Barrios* itself. *See Payne v. Kerns*, 467 P.3d 659, 660 (OK 2020). Because the instant factual basis accrued in 2016, *Barrios* forecloses Plaintiff's state constitutional claim.

## CONCLUSION

For the foregoing reasons, the Court finds that Plaintiff may proceed only with his Section 1983 claim against Defendants Dr. McElroy and Nurse Wood.

**IT IS THEREFORE ORDERED** that Defendant Dr. McElroy's Motion to Dismiss (Doc. 13) is hereby **GRANTED** with respect to Plaintiff's common law negligence and state constitutional claims but **DENIED** with respect to Plaintiff's Section 1983 claim.

**IT IS FURTHER ORDERED** that Defendant Nurse Wood's Motion to Dismiss (Doc. 17) is hereby **GRANTED** with respect to Plaintiff's common law negligence and state constitutional claims but **DENIED** with respect to Plaintiff's Section 1983 claim.

**IT IS FURTHER ORDERED** that Defendant Nurse Phillip's Motion to Dismiss Plaintiff's three claims asserted against her (Doc. 31) is hereby **GRANTED**.

_____
WILLIAM P. JOHNSON
UNITED STATES DISTRICT JUDGE